UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BRAD BARBACK, | |
| Plaintiff, | CASE NO. |
| vs. | JURY DEMANDED |
| BRYAN FISHER, AND BRYAN D. FISHER, LLC | |
| Defendants. | |

## COMPLAINT AND JURY TRIAL DEMAND

NOW INTO COURT, through undersigned counsel, comes Plaintiff, **BRAD BARBACK**, who files this Complaint against Defendants, **BRYAN FISHER** and **BRYAN D. FISHER, LLC**.

## PRELIMINARY STATEMENT

1.

Personal injury lawyer Bryan Fisher is the owner of Bryan D. Fisher, LLC, a law firm operating under the name "Fisher Injury Lawyers" (collectively, referred to as "Fisher").

2.

Fisher advertises himself as a "renowned trial lawyer" with offices in Baton Rouge, Texas and New York, who has the "rare distinction of having won over $15,000,000 at trial...TWICE," and who has recovered over $125 million dollars for his clients. Despite this professed success, Fisher concocted a scheme to exploit the Covid-19 pandemic, pressure his employees to work without pay, and use federal and state

unemployment benefits to indirectly fund the operation of his law firm. Plaintiff Barback refused to participate in this unlawful scheme. He complained, and encouraged another employee to complain, about Fisher's work for free scheme, and was immediately fired in retaliation.

3.

Governor John Bel Edwards issued a stay at home order on March 22, 2020. In the following week, Fisher earned approximately $750,000 in fees earned from several personal injury cases, in an effort to stockpile what Fisher would later describe as a "cash reserve." At the end of that same week, Fisher laid off all four of his employees in a string of Sunday evening text messages, citing a lack of revenue and concerns his law firm might not survive the economic crisis caused by the Covid-19 pandemic. Fisher told his employees to apply for unemployment benefits that night because he would not be paying them going forward. Yet, in the same series of text messages, Fisher asked his employees to "volunteer" to continue working in the same capacities without pay. Fisher demanded that each employee let him know their decision "ASAP."

4.

Barback was shocked by Fisher's proposal and did not agree to work for free. In response, Fisher cut Barback's pay to 1/3 of his salary. A few days later, Barback complained about and encouraged another employee (who was suffering from the coronavirus and working without pay) to complain about Fisher's work for free scheme. On April 2, 2020, Fisher fired Barback in response.

**JURISDICTION AND VENUE**

5.

This is an action arising under the Fair Labor Standards Act, 29 U.S.C. § 201, *et*

*seq.* (FLSA), La. R.S. 23:967, and the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*.

6.

The Court has jurisdiction over this action over Plaintiff's FLSA claim pursuant to 28 U.S.C. § 1331 and § 1337.

7.

The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiff's claims under Louisiana law form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share common operative facts with his federal law claims, and the parties are identical. Resolving all state and federal claims in a single action serves the interest of judicial economy, convenience, and fairness to the parties.

8.

Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. § 1391(b) because all of a substantial part of the events and/or omissions giving rise to the claim occurred in this District and Defendants reside in this District.

9.

Defendants are engaged in commerce pursuant to 29 U.S.C. § 203(s).

10.

Defendants' annual gross volume of sales made or business done has exceeded $500,000 for each year during the relevant time period.

11.

Defendants have a common business purpose and exercise unified operation and common control. They therefore qualify as an enterprise pursuant to 29 U.S.C. § 203(r).

12.

Defendant Bryan Fisher is the sole owner and managing member of Bryan D. Fisher, LLC.  He acts, and has the power to act, on behalf of the company.

13.

Fisher sets company-wide pay practices and policies, including the policies complained of herein.

14.

Plaintiff hereby requests a trial by jury on all counts so triable.

## PARTIES

15.

Barback is an individual over the age of majority domiciled in East Baton Rouge Parish and a Louisiana-licensed attorney.  In September 2019, Fisher initiated contact with Barback and began recruiting him, promising Barback not only more money, but that Barback "had a future" with Fisher's firm.  After additional discussion Barback left his current firm (where he had been working for only a few months) to work for Fisher.  Barback fully believed this would be a long-term career move.

16.

Defendant Bryan Fisher is an individual over the age of majority domiciled in East Baton Rouge Parish.

17.

Defendant Bryan D. Fisher, L.L.C. is a Louisiana limited liability company whose sole member and manager is Defendant Bryan Fisher.

18.

Bryan Fisher and Bryan D. Fisher, LLC operate a personal injury law firm under

the name "Fisher Injury Lawyers" in Baton Rouge (Defendants and their law firm are sometimes referred to collectively as simply "Fisher").

19.

At the time of the initial events discussed below, Fisher also employed four other individuals - an assistant, two paralegals ("Paralegal 1" and "Paralegal 2"), and another individual whose specific job title and employment duties are unknown to Barback.

## GENERAL ALLEGATIONS

20.

**March 19, 2020.**  Eight days into the Covid-19 pandemic, at 8:58 a.m., Fisher sent a Thursday morning text message to all of his employees stating, "business has all but stopped," that the firm may run out of money, and that "the state is increasing unemployment benefits."[1]  "I tell you this to give you options," Fisher cryptically texted to his employees.

21.

The ominous message left his employees befuddled.  There was no indication around the office that business was slowing down, much less "all but stopped."  The firm's docket included approximately 100 active personal injury cases.  Barback had settled a product liability case pre-suit for $170,000 two days prior, and the firm signed up a new client just the day before.  On March 20th, Fisher fired his assistant, leaving the firm with four remaining employees.

22.

**March 22, 2020 (Sunday).**  Governor Edwards issued Proclamation Number

---

[1] Presumably Fisher was referring to the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), which at the time was only a proposed legislation in the U.S. Congress that would provide an additional unemployment benefits from the federal government.  The CARES Act was not actually passed by Congress until 8 days later, on March 27, 2020.  https://www.congress.gov/bill/116th-congress/house-bill/748.

33 JBE 2020, commonly referred to as the "Stay at Home Order."[2] The Order required certain businesses to close but did not place any restrictions on law firms with less than ten employees, such as Fisher Injury Lawyers.

23.

That same Sunday, Fisher called Barback at 3:20 p.m. to advise that Barback would be the only employee working in the office the following week, with everyone else working remotely. Fisher ordered Barback to take on additional responsibilities normally performed by other staff, including checking and circulating the mail and making bank runs to deposit checks in the firm account as instructed by Fisher.

24.

That same Sunday, Fisher sent out an email blast to former and potential clients and posted on the firm's Facebook account the same message stating that Fisher Injury Lawyers "remain on the job, working remotely….pushing your cases and helping newly injured clients," and that the firm is "a fully digital office with the capacity to perform all of our job duties remotely."

25.

**March 23 (Monday) through March 27 (Friday).** Over the course of the work week following Governor Edwards' Stay at Home Order, Fisher Injury Lawyers received approximately $2,000,000 in settlement checks from several different personal injury cases, equating to approximately $750,000 in attorney's fees.

26.

**Sunday March 29, 2020**. Two days after Congress passed enhanced unemployment benefits, Fisher sent a series of Sunday evening text messages to his four

---

[2] https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf.

employees instructing all of them to file for unemployment benefits that night, so they could receive unemployment checks that upcoming week. Fisher would no longer be paying them going forward:



27.

In the same series of text messages Fisher asked all of his employees to "volunteer" to continue working for free, supposedly making it "the more likely we are to get back to full salaries or wages sooner." Fisher then demanded each employee let him know his or her decision "ASAP". Despite Fisher's claim that this scheme was "completely voluntary," the coercive force and implied threat is clear:



28.

Unbeknownst to Barback, Fisher had already discussed this plan with his paralegal, Paralegal 1, who had already filed for unemployment and who would immediately agree to Fisher's request for "volunteer" work, texting, "I'm all in for business as usual" and "We're all in this together!" Several minutes later, Paralegal 2 responded in kind, indicating agreement. Barback did not respond to the text message.

29.

**March 30, 2020 (Monday).** The following morning, Fisher texted Barback separately to ask for Barback's decision. Barback responded by only saying he would have to continually review his options going forward as he could only go so long without an income.

30.

Fisher immediately called Barback and began to tell him about options available for Barback to defer payments on his mortgage and other monthly bills. Fisher then reminded Barback that Fisher's two paralegals had agreed to continue working without pay and again asked Barback his intentions. It was clear Fisher was trying to pressure Barback into working for free. Barback refused and simply told Fisher that he would

have to continually asses his options moving forward.

### 31.

After repeated failed attempts to get Barback to work for free, Fisher then told Barback that instead of laying him off without pay, he would temporarily reduce Barback's pay to 1/3 of his then salary (*i.e.*, $40,000). This sum was conveniently less than the amount of available unemployment benefits, accordingly to Fisher's own advice. In short, Fisher attempted to coerce Barback into working for free while receiving unemployment benefits rather than make less working for a drastically reduced salary.

### 32.

It is evident by Fisher's actions that he had no intention to actually lay off his employees, which would have required he individually manage all of the firm's operations, including its 100-case docket. Rather, Fisher set out on an intentional scheme to manipulate his employees into working for him for free while the government paid them unemployment benefits. In essence, Fisher used government unemployment benefits to fund the operations of his own (very profitable) law firm.

### 33.

**April 1, 2020 (Wednesday).** A few days after the layoffs, Paralegal 1 sent an after-hours email to Barback stating that Fisher was "pressing [her] hard for case list updates." At the time, Paralegal 1 was quarantined at home, recovering from the coronavirus and working without pay.

### 34.

**April 2, 2020 (Thursday).** The following morning, Barback emailed Paralegal 1 the current status of several pending cases and told her she could include

them in her case list update that Fisher was "pressing" her for. Later that same morning, Paralegal 1 emailed Barback asking for additional information for the list otherwise, she wrote, Fisher "is going to kick my ass."

35.

By this time, Barback had grown increasingly disgusted with Fisher's work for free scheme. Not only was Paralegal 1 being "press[ed]" by Fisher to work for free and afraid Fisher was going to "kick [her] ass," she was also quarantined at home suffering from the coronavirus. At 11:33 a.m. Barback emailed a response to Paralegal 1, telling her "I'd invite you to remind [Fisher] that you are working for free."

36.

Barback intended the email message as an encouragement to Paralegal 1 to complain about working for free, but also specifically intended the message to be received by Fisher as a complaint about Fisher's illegal practice of not paying his employees. Barback fully believed the complaint email would be received by Fisher and, in fact, the complaint email was reviewed by Fisher.

37.

First, it was apparent to Barback that Fisher was monitoring Barback's emails at the time. Earlier that morning Barback sent an email to himself. The contents of the email were limited to the email address of an opposing counsel in one of Barback's cases. Strangely, despite not being copied on the email, Fisher responded to the innocuous email with only a question mark ("?"). The only explanation for Fisher's response was that he was monitoring Barback's emails. It was the first time Barback ever noticed Fisher monitoring his emails. After this exchange Barback operated under the expectation that Fisher was reviewing all emails sent and received by Barback,

them in her case list update that Fisher was "pressing" her for. Later that same morning, Paralegal 1 emailed Barback asking for additional information for the list otherwise, she wrote, Fisher "is going to kick my ass."

35.

By this time, Barback had grown increasingly disgusted with Fisher's work for free scheme. Not only was Paralegal 1 being "press[ed]" by Fisher to work for free and afraid Fisher was going to "kick [her] ass," she was also quarantined at home suffering from the coronavirus. At 11:33 a.m. Barback emailed a response to Paralegal 1, telling her "I'd invite you to remind [Fisher] that you are working for free."

36.

Barback intended the email message as an encouragement to Paralegal 1 to complain about working for free, but also specifically intended the message to be received by Fisher as a complaint about Fisher's illegal practice of not paying his employees. Barback fully believed the complaint email would be received by Fisher and, in fact, the complaint email was reviewed by Fisher.

37.

First, it was apparent to Barback that Fisher was monitoring Barback's emails at the time. Earlier that morning Barback sent an email to himself. The contents of the email were limited to the email address of an opposing counsel in one of Barback's cases. Strangely, despite not being copied on the email, Fisher responded to the innocuous email with only a question mark ("?"). The only explanation for Fisher's response was that he was monitoring Barback's emails. It was the first time Barback ever noticed Fisher monitoring his emails. After this exchange Barback operated under the expectation that Fisher was reviewing all emails sent and received by Barback,

them in her case list update that Fisher was "pressing" her for. Later that same morning, Paralegal 1 emailed Barback asking for additional information for the list otherwise, she wrote, Fisher "is going to kick my ass."

35.

By this time, Barback had grown increasingly disgusted with Fisher's work for free scheme. Not only was Paralegal 1 being "press[ed]" by Fisher to work for free and afraid Fisher was going to "kick [her] ass," she was also quarantined at home suffering from the coronavirus. At 11:33 a.m. Barback emailed a response to Paralegal 1, telling her "I'd invite you to remind [Fisher] that you are working for free."

36.

Barback intended the email message as an encouragement to Paralegal 1 to complain about working for free, but also specifically intended the message to be received by Fisher as a complaint about Fisher's illegal practice of not paying his employees. Barback fully believed the complaint email would be received by Fisher and, in fact, the complaint email was reviewed by Fisher.

37.

First, it was apparent to Barback that Fisher was monitoring Barback's emails at the time. Earlier that morning Barback sent an email to himself. The contents of the email were limited to the email address of an opposing counsel in one of Barback's cases. Strangely, despite not being copied on the email, Fisher responded to the innocuous email with only a question mark ("?"). The only explanation for Fisher's response was that he was monitoring Barback's emails. It was the first time Barback ever noticed Fisher monitoring his emails. After this exchange Barback operated under the expectation that Fisher was reviewing all emails sent and received by Barback,

specifically including the complaint email sent to Paralegal 1.

38.

Second, it was a regular practice for Paralegal 1 to keep Fisher apprised of all communications in the office. Paralegal 1 operated as an officer manager, who also handled accounting and human resource duties in addition to her general paralegal duties. Fisher, who spends much of his time away from the office and at his vacation homes in other states, would regularly communicate with all of his employees through Paralegal 1, and it was typical for Paralegal 1 to constantly provide Fisher with updates on the status of the office including communication with all other employees.

39.

Fisher did receive Barback's complaint email, as expected, and took immediate action to retaliate against Barback for sending the complaint email.

40.

Within approximately 30 minutes of sending the email Barback was locked out of his work accounts, including his email account. His office phones, which operate over the internet, were shut off.

41.

Minutes later Fisher arrived at the office. He peeked his head in Barback's office and noticed Barback's 12-year old son was there doing his schoolwork. Fisher immediately left the office after being there for less than a minute.

42.

At 12:19 p.m., about 45 minutes after Barback sent the complaint email, Fisher called Barback and after initial greetings, immediately stated, "I've locked you off of the server, it's time for you to get your stuff and go. This is over. Leave your key in the front

door. I don't appreciate the email you sent to [Paralegal 1] earlier. I don't appreciate you telling her she is working for free."

43.

Barback told Fisher he did not appreciate the way Fisher was running the office and asking his employees to work for free. Fisher told Barback "you are the only one who is receiving anything" [i.e. a wage].

44.

Minutes after the call, at 12:24 p.m. and less than an hour after Barback's complaint email, Fisher texted Barback "leave the key in the lock on the outside of the door."

45.

Barback then packed up his belongings, gathered his 12-year-old son with his schoolwork, and walked out the office. Fisher sat on a curb in the parking lot and watched Barback and his son pack up their car before yelling across the parking lot, "leave the key in the door," which Barback had already done.

46.

Shortly after returning home, Barback received a text from Fisher attempting to mischaracterize Fisher's obvious termination of Barback. Fisher texted, "Despite today, I will not change your status to quit from paid [sic] off" and threatened Barback not to "do or say anything that may adversely affect" the firm, telling him "You will need our support including a positive reference." Barback understood the text as a threat, that if Barback told anyone about or took any action to expose Fisher's illegal work for free scheme, Fisher would retaliate further against Barback.

47.

Barback texted in response, "I appreciate the honest act of you not changing my status to quit after you fired me earlier today." Fisher responded, "Maybe pause before you text me. You are not helping your cause." Barback replied, "I am just being honest about what happened today." Fisher responded, "I intended to fully lay you off today" but went on to again attempt to insinuate that Barback had quit. Barback then responded, "I don[']t appreciate the attempts to create a false record. I believe before I said anything other than hello your words were 'I've locked you off of the server, it's time for you to get your stuff and go. This is over. Leave your key in the front door.'" Fisher then responded "there is no attempt at anything. I intended to fully lay you off," before telling Barback to stop communicating with him. Finally, Barback responded "I have/had no intention of communicating with you after you fired me. I'm only doing so to be clear that I was fired today. I wish you nothing but the best in the future."

48.

During this text exchange Fisher also told Barback that he should "consider joining the balance of our team and being cooperative," which Barback understood to mean if he wanted to keep his job he would have to cooperate with Fisher's work for free scheme.

49.

Although Barback performed no work for Fisher after April 2, 2020, Fisher kept Barback's name and photograph on his website through at least July 9, 2020.

50.

 Fisher's retaliatory termination of Barback left Barback unemployed, with a sullied resume, during a time of record-high unemployment not seen since the Great

Depression.

# COUNT ONE

## Retaliation under FLSA, 29 USC § 215

51.

The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

52.

The FLSA applied to Defendants' employment of Barback and Paralegal 1 and Paralegal 2 at all times relevant herein.

53.

Section 6 of the FLSA, 29 U.S.C. § 206, mandates that employers pay all employees minimum wages for their work in an amount set by federal law.

54.

Fisher willfully and intentionally sought out, requested, and accepted work from their employees without payment of wages.

55.

Section 15 of the FLSA, 29 U.S.C. § 215, prohibits retaliation against an employee for exercising rights or making "any complaint" under the FLSA.

56.

Barback's actions as alleged above, including his refusal to participate in the work for free scheme, sending a complaint email, and complaining to Fisher, constituted protected activity under the FLSA.

57.

Fisher's actions alleged above, including his drastic reduction of Barback's salary

and ultimate termination of Barback constituted a retaliatory action, undertaken in direct response to Barback's protected activity.

58.

As a direct, foreseeable, and proximate result of Fisher's actions, Plaintiff has suffered damages, including loss of past and future earnings, job benefits, reputation and employability, emotional distress, and additional expenses, all of which are continuing.

59.

Fisher committed the acts herein complained of maliciously, fraudulently, and oppressively with the wrongful intent to injure Plaintiff.

60.

Plaintiff is entitled to all legal and equitable relief including but not limited to, compensatory damages, liquidated damages in the same amount, and punitive damages, as well as reasonable attorney fees and costs.

## COUNT TWO

## Louisiana Whistleblower Protection, La. R.S. 23:967

61.

The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

62.

Pursuant to La. R.S. 23:967, an employer is forbidden from taking reprisal against an employee who "Discloses or threatens to disclose a workplace act or practice that is in violation of state law" or "Objects to or refuses to participate in an employment act or practice that is in violation of law."

63.

Fisher's conduct alleged herein violated numerous state and federal laws.

64.

Barback refused to participate in Fisher's illegal work for free practice and also objected to the practice.

65.

In direct response to Barback's refusal to participate in Fisher's illegal work for free scheme and objection thereto, Fisher cut Barback's pay by two-thirds and ultimately terminated Barback. Both the pay cut and the termination constitute a "reprisal" under La. R.S. 23:967.

66.

As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiff has suffered damages, including loss of past and future earnings, job benefits, reputation and employability, emotional distress, and additional expenses, all of which are continuing.

67.

Defendants committed the acts herein complained of maliciously, fraudulently, and oppressively with the wrongful intent to injure Plaintiff.

68.

Plaintiff is entitled to damages, including compensatory damages, back pay, benefits, front-pay in lieu of reinstatement, reasonable attorney fees, and court costs.

## **COUNT THREE**

**Louisiana Unfair Trade Practices Act (LUTPA), La. R.S. 51:1401,** *et seq*

69.

Under the Louisiana Unfair Trade Practices Act (LUTPA), La. R.S. 51:1405, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are … declared unlawful."

70.

Louisiana courts have interpreted "Unfair methods of competition and unfair or deceptive acts or practices" to include acts "involving elements of fraud, misrepresentation, deception, or other unethical conduct," *Cheramie Services, Inc. v. Shell Deepwater Production*, 2010 W.L. 1631977 (La. 2010), as well as acts that "offend established public policy and/or acts which are immoral, unethical, oppressive, unscrupulous or that are substantially injurious to the consumer." *Marshall v. Citicorp*, 601 So. 2d 669, 670-671 (La. App. 5 Cir. 1992), citing *Gautreau v. Southern Milk Sales, Inc.,* 509 So. 2d 495 (La. App. 3 Cir. 1987); *Crown Buick, Inc. v. Bercier*, 483 So. 2d 1310 (La. App. 4 Cir. 1986).

71.

Defendants' actions as alleged above violate state and federal law, and are immoral, unethical, oppressive, and unscrupulous.

72.

As a direct result of Fisher's unlawful conduct, Barback has suffered a loss of money and property and damages, including lost wages, increased expenses, loss of reputation, loss of employability, mental anguish, and other damages to be shown at trial.

73.

Pursuant to La. R.S. 51:1409, Barback is entitled to an award for his damages as well as reasonable attorney fees and costs, and treble damages according to law.

74.

As required by La. R.S. 51:1409, a copy of this Complaint is being sent to Louisiana Attorney General, Jeff Landry.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against Defendants and in favor of Plaintiff for:

1. General, compensatory, and special damages, including past and future lost earnings, backpay, benefits, front-pay in lieu of reinstatement, loss of reputation, loss of employability, and mental anguish;

2. Liquidated, punitive, and treble damages;

3. Attorney fees and costs;

4. Pre- and post-judgment interest; and

5. All such other legal and equitable relief that may be proper.

*/s Charles J. Stiegler*
Charles J. Stiegler, #33456
STIEGLER LAW FIRM LLC
318 Harrison Ave., Suite 104
New Orleans, La. 70124
(504) 267-0777 (telephone)
(504) 513-3084 (fax)
Charles@StieglerLawFirm.com